Gen. 303]                                                                      303

**INSURANCE – DEBT CANCELLATION AGREEMENTS BETWEEN LENDER AND BORROWER ARE NOT CONTRACTS OF INSURANCE**

October 17, 1994

*Ms. Jean Bienemann*
*Associate Insurance Commissioner*

You have requested our opinion whether debt cancellation agreements constitute contracts of insurance. If so, you have also requested an opinion whether lenders that offer such contracts are subject to the jurisdiction of the Insurance Commissioner.

For the reasons stated below, we conclude that debt cancellation agreements are not contracts of insurance when made between a lender and a borrower, and therefore lenders who offer these contracts are not subject to the jurisdiction of the Insurance Commissioner.[1]

**I**

**Background**

Debt cancellation agreements are agreements between lenders and borrowers under which the lender agrees to cancel the debt if certain events occur. These agreements, commonly used in the purchase of automobiles, are offered to the borrower either as part of the financing agreement or as a separate contract. Debt cancellation agreements provide in essence that the lender agrees to cancel the remainder of the debt, after deducting the amount covered by the insured's primary insurance, in the event of the death of the borrower or the total loss of the automobile due to fire, theft, or collision.[2]

---

[1] This conclusion does not apply to third parties who contract with either the borrower or the lender to pay money to the lender on the borrower's behalf.

[2] The premise of a debt cancellation agreement, of course, is that

(continued...)

Automobile dealers often offer direct loans on behalf of specific lenders. These loans and the accompanying debt cancellation agreements are made directly in the name of the lender. Automobile dealers also offer "indirect loans." These loans are made at the direction of and with the approval of a specific lender. The loan, however, technically is made in the name of the dealer. The loan, together with the debt cancellation agreement, is then immediately assigned to the lender.

## II

### Debt Cancellation Agreements As Insurance Contracts

In 49 *Opinions of the Attorney General* 269 (1964), Attorney General Finan concluded that debt cancellation agreements, linked to the death of the borrower, were contracts of insurance. This opinion was based in part on an earlier opinion on the same subject. *See* 13 *Opinions of the Attorney General* 151 (1928). The 1928 opinion concluded as follows:

> [E]very element of the definition of insurance is present [in debt cancellation agreements], and it makes no difference whether the contract is ancillary to its chief business and is mainly for advertising ends, in view of the absolute prohibition contained in Article 48A against the making of contracts for insurance except by companies and in the manner authorized by law.

13 *Opinions of the Attorney General* at 152. The 1964 opinion reached a similar conclusion:

> [T]he conclusion becomes inescapable that [debt cancellation agreements] amount to contracts of life insurance. The cancellation of the loan on the death of the borrower gives the estate of the borrower a benefit, in an amount equal to the outstanding balance of the

---

[2] (...continued)
the balance of the loan exceeds the proceeds of the primary coverage on the vehicle. For the typical vehicle, this variance would exist for about three years.

loan, wholly predicated upon the chances or
probabilities of the borrower's duration of life.
The benefits are specific and determinable, as
is the peril insured against, and the
consideration is definite and certain. All of
the elements of insurance are present.

49 *Opinions of the Attorney General* at 270.

If a lender's agreement to cancel a debt owed to it if the debtor
dies is insurance, so is a debt cancellation agreement identifying the
total loss of the vehicle as the triggering event. The "peril" of total
loss is as "specific and determinable" as death. A straightforward
application of these prior opinions would answer your first question
affirmatively – that a debt cancellation agreement is a contract of
insurance.

Put another way, we could conclude that a debt cancellation
agreement predicated on the vehicle's total loss is *not* a contract of
insurance only if we overruled 49 *Opinions of the Attorney General*
269 and 13 *Opinions of the Attorney General* 151. We overrule a
prior opinion only if we are convinced that subsequent developments
have eroded the basis for the prior opinion's conclusion or that its
reasoning was plainly wrong. *See* 72 *Opinions of the Attorney
General* 200, 202 (1987). In this instance, we shall consider whether
subsequent cases and opinions require a deeper analysis of the issue
than that set out in the 1928 and 1964 opinions.

In determining whether a given contract is a contract of
insurance, Attorney General Burch observed that "'the line between
insurance and noninsurance may be more fluid and unstable than
many dare imagine.'" 63 *Opinions of the Attorney General* 422, 424
(1978) (quoting Dennenberg, *The Legal Definition of Insurance*, 30
J. Ins. 319, 335 (1963)). A source of difficulty in line-drawing is the
seemingly sweeping definition of insurance contained in Article
48A, §2 of the Maryland Code. This section provides as follows:
"'[I]nsurance' is a contract whereby one undertakes to indemnify
another or pay or provide a specified or determinable amount or
benefit upon determinable contingencies." *See also* Article 48A, §3
(defining "insurer" as one who enters "contracts of insurance").

"The definition of insurance contained in Section 2 is broad
enough to cover both indemnity and non-indemnity contracts." 63
*Opinions of the Attorney General* at 424. The definition includes
"not only promises of strict indemnity but also promises to pay or

provide a specific or determinable amount or benefit upon determinable contingencies." *Id*. Thus, the Attorney General has recognized that "[b]y using the term 'provide' the statute includes contracts for the rendition of service." *Id. See also* 75 *Opinions of the Attorney General* 319, 323 (1990).

This office, applying the definition in a variety of contexts over the past 60 years, has concluded that contracts of insurance existed where: a hospital, for an annual membership fee, agreed to provide medical care to participants, 18 *Opinions of the Attorney General* 303, 304 (1933); a funeral company, for an annual membership fee, agreed to provide the member with a funeral at his or her death, 16 *Opinions of the Attorney General* 171 (1931); a company selling memorial stones agreed to repair the stones if they were damaged by vandalism, 48 *Opinions of the Attorney General* 214 (1963); a dental group agreed to provide dental benefits to participants at a reduced rate based on a periodic fee, 72 *Opinions of the Attorney General* 167 (1987); and health care providers agreed to provide medical care for the payment of a premium in the form of a capitation payment, 75 *Opinions of the Attorney General* 319. In none of these situations was money actually paid by an insurer to a third party. Instead, a benefit or service was provided directly by the insurer to the insured.

In each of these situations, however, two things were true: if a defined contingency occurred, one party to the contract, the payer of a fee, would suffer a measurable loss because of the occurrence; and the other party to the contract, the recipient of the fee, promised to devote resources in the future to make good that loss. To be sure, those resources were measured by the time of service providers (health care professionals or mortuary stone masons, for example) rather than by money out of pocket. The recipient of the fee, nevertheless, would have to do *something* to carry out its contractual undertaking and therefore would need "reserves" of some kind to assure performance.

Under a debt cancellation agreement, by contrast, the vehicle owner gets the benefit of the bargain without any action whatever by the lender. If the contingency of total loss of the vehicle occurs, theowner simply stops repaying his or her loan. We are doubtful whether this self-executing contract involves the kind of "benefit" intended to be encompassed by Article 48A, §2.

Our doubts are underscored by the analysis in a recent federal decision. In *First National Bank of Eastern Arkansas v. Taylor*, 907 F.2d 775 (8th Cir.), *cert. denied*, 498 U.S. 972 (1990), the court considered the question whether a state insurance commissioner could prohibit a bank from entering into debt cancellation agreements. The court first held that the "incidental powers" of national banks under the National Bank Act, 12 U.S.C. §24, included the authority to offer debt cancellation agreements. 907 F.2d at 778. The court then held that, "[b]ecause national banks are considered federal instrumentalities, states may neither prohibit nor unduly restrict their activities ..." as authorized by federal law. 907 F.2d at 778 (citation omitted).

The court went on to consider whether the McCarran-Ferguson Act, 15 U.S.C. §101 *et. seq.*, restricted the preemptive effect of the National Bank Act. The court concluded that, "because the debt cancellation contracts offered by the bank fall within the incidental powers granted by the National Bank Act, they do not constitute the 'business of insurance' under the McCarran-Ferguson Act." 907 F.2d at 779. Moreover, the court observed, debt cancellation agreements, when offered by banks, are significantly different than traditional insurance contracts:

> Although debt cancellation contracts may ... transfer some risk from the borrower to the bank, the contracts do not require the bank to take an investment risk or to make payment to the borrower's estate. The debt is simply extinguished when the borrower dies. Thus, the primary and traditional concern behind state insurance regulation − the prevention of insolvency − is not of concern to a borrower who opts for a debt cancellation contract.

907 F.2d at 780. This analysis, although an application of federal law, seems to us well-reasoned.

Moreover, even when a given contract seemingly fits within Article 48A's definition of "insurance," more recent opinions have stated repeatedly that a contract is not truly an insurance contract unless it also meets five generally accepted indicia for insurance, including the following: "The insured is subject to a risk of loss through the destruction or impairment of [the insured's] interest by the happening of designated perils." 75 *Opinions of the Attorney*

*General* at 323; 72 *Opinions of the Attorney General* 167, 170 (1987); 55 *Opinions of the Attorney General* 196, 198 (1970); 42 *Opinions of the Attorney General* 254, 256-57 (1957).[3]

It seems to us incorrect to characterize the vehicle owner as "subject to a risk of loss" *with respect to the loan balance* "through the destruction or impairment of [the owner's] interest [in the vehicle] by the happening of designated perils." The owner's obligation to pay the loan exists independently of the vehicle itself. If a vehicle is stolen or destroyed, obviously there is a loss − a "decrease in amount, magnitude, or kind" − with respect to the vehicle. *Horace Mann Ins. Co. v. Worthy*, 90 Md. App. 273, 279, 600 A.2d 1151 (1991) (internal quotation marks and citation omitted). The loan itself, however, is precisely as it was before the total loss of the vehicle. Doubtless the owner is dismayed by having to pay off a loan on a vehicle that the owner no longer has (and the thought of having to do so causes some buyers to pay for debt cancellation agreements), but there is no nexus between the peril and the debt contract.

In sum, we think that the prior opinions' reliance on the breadth of the term "benefit," without consideration of either the self-executing nature of the benefit or the relationship between loss and benefit, cannot survive under current analysis. We conclude, rather, that debt cancellation agreements are more akin to collision damage waiver contracts, which are agreements between a car rental company and the lessee whereby the rental company, for a fee, agrees to waive any liability that the lessee has for collision damage to the car. A number of courts have held that these contracts are not insurance contracts. *See Truta v. Avis Rent-A-Car System*, 238 Cal. Rptr. 806 (Cal. App. 1987); *Chabraja v. Avis Rent-A-Car System*, 549 N.E. 2d 872 (Ill. App. 1989); *Hertz Corp. v. Corcoran*, 520 N.Y.S.2d 700 (N.Y. Sup. Ct. 1987). Just as the rental company

---

[3] The other criteria cited in these opinions are whether "[t]he insured possesses an interest of some kind susceptible of pecuniary estimation, known as an insurable interest"; whatever the insurer assumes the risk of loss resulting from the peril; whether that assumption of risk "is part of a general scheme to distribute actual losses among a large group of persons bearing somewhat similar risks"; and whether "[a]s consideration for the insurer's promise, the insured makes a ratable contribution, called a premium, to a general insurance fund." This more detailed inquiry is necessary to avoid sweeping all warranties and other contingent contractual undertakings into the category of insurance.

clearly can accept liability as a matter of contract for damage to its own property without being an insurer, so the lender can identify by contract a circumstance under which the lender will deem the debt to be fully satisfied.[4]

The California court in *Truta*, quoting a memorandum from the California Department of Insurance in which that agency denied that it had jurisdiction over collision damage waivers, made a fundamental point that applies to debt cancellation agreements as well:

> Since the lessor [here, the lender] is not agreeing to pay anybody anything, but is simply agreeing not to hold the lessee [here, the borrower] liable, there is no need for accumulating reserves. The solvency or insolvency of the lessor does not affect this contractual provision.

238 Cal.Rptr. at 813 (internal quotation marks omitted). Under the circumstances, we do not see how an application of the entire regulatory apparatus of the Insurance Code to these agreements would further any discernable legislative purpose.[5]

Of course, a lender might engage in unfair or deceptive practices in the marketing of debt cancellation agreements. If the Insurance Code applied, these practices could be addressed under

---

[4] One very recent Arkansas case, *Douglas v. Dynamic Enterprises, Inc.*, 869 S.W.2d 14 (Ark. 1994), holds that a debt cancellation agreement is a contract of insurance under that state's law. Because of differences between the laws of Arkansas and Maryland, and because of certain special characteristics of the agreement at issue in the case, the decision does not alter our analysis. In this regard, we understand that insurance regulators in some 16 other states have concluded that debt cancellation agreements are outside the scope of insurance regulation.

[5] There is no evidence that this issue has ever come to the attention of the General Assembly. Hence, no inference of legislative acquiescence in the Attorney General's prior interpretation need be drawn. *Cf. Board of Trustees v. Life & Health Ins. Guaranty Corp.,* 335 Md. 176, 195, 642 A.2d 856 (1994) (finding legislative acquiescence when the Insurance Commissioner's interpretative rule "ha[d] been brought to the attention of the General Assembly following promulgation of the regulation").

Subtitle 15 of Article 48A.  Although we find the Insurance Code to be inapplicable, such practices nevertheless are subject to administrative and judicial remedy under the Maryland Consumer Protection Act, Title 13 of the Commercial Law ("CL") Article, Maryland Code.  In addition, your request does not require us to consider the impact of any of the credit laws — in particular, CL §12-1005(c)(2), which limits the charging of certain fees in consumer loans to "actual and verifiable expense[s] of the credit grantor not retained by him."

## III

### Conclusion

In summary, it is our opinion that a debt cancellation agreement between a borrower and a lender is not an insurance contract under Maryland law.  We hereby overrule 49 *Opinions of the Attorney General* 269 (1964) and 13 *Opinions of the Attorney General* 151 (1928).

J. Joseph Curran, Jr.
*Attorney General*

Jack Schwartz
*Chief Counsel*
*Opinions & Advice*

Dennis W. Carroll
*Assistant Attorney General*